**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

---

| | |
|---|---|
| Dusten Mullen and the Arizona Conference of Police and Sheriffs ("AZCOPS"),<br><br>Plaintiffs,<br><br>vs.<br><br>Matthew Giordano, in his official capacity as Chief of Police of the Phoenix Police Department, the City of Phoenix, a municipal corporation, and Anna Hernandez, in her official capacity as Phoenix City Councilmember, District 7,<br><br>Defendants. | No. 2:26-cv-02911-SMB<br><br>Phoenix, Arizona<br>May 18, 2026<br>3:01 p.m. |

**BEFORE: THE HONORABLE SUSAN M. BRNOVICH, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**MOTION FOR TEMPORARY RESTRAINING ORDER**

Official Court Reporter:
Christine M. Coaly, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 37
Phoenix, Arizona 85003-2151
(602) 322-7248

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

**A P P E A R A N C E S**

For the Plaintiffs:

STEVEN J. SERBALIK, PC
By: **Mr. Steven J. Serbalik, Esq.**
4925 E Desert Cove Ave., Ste. 116
Scottsdale, AZ 85254

For the Defendant:

PIERCE COLEMAN, PLLC
By: **Mr. Stephen B. Coleman, Esq.**
17851 N 85th St., Ste. 175
Scottsdale, AZ 85255

**P R O C E E D I N G S**

COURTROOM DEPUTY: On the record in civil docket 26-2911, Dusten Mullen versus Matthew Giordano. This is the time set for a motion hearing.

Counsel, please announce for the record.

MR. SERBALIK: Good afternoon, Your Honor. Steve Serbalik for the plaintiffs.

MR. COLEMAN: Good afternoon, Your Honor. Steve Coleman on behalf of the defendants.

THE COURT: Okay. And we're set for oral argument on the motion for TRO that was filed May 14th. I've read the motion, the response, and the reply.

Mr. Serbalik, do you have any evidence that you plan on presenting? I know the transcripts are attached and some other things which I have considered, but I thought there was some mention of video.

MR. SERBALIK: Yes, Your Honor. I do have a video that I am prepared to show the Court, and I also have, potentially, Lieutenant Thatcher to testify briefly to provide some additional context.

THE COURT: Okay. Why don't we see that video.

How long is it?

MR. SERBALIK: Four minutes and 20 seconds.

THE COURT: Okay.

MR. SERBALIK: And to set the stage for the video.

This starts after his conversation with the sergeant from the Chandler Police Department, and it's the four minutes and 20 seconds prior to the statement that has been at issue of: I'm, essentially, wanting to have people arrested, or to be assaulted.

(Playing video.)

MR. SERBALIK: So, Your Honor, the reason that I wanted to show this video is this has, first, been taken wildly out of context of this idea that Sergeant Mullen's plan from the beginning was to be assaulted and to have people taken to jail.

What happened, and as we presented in the Loudermill presentation, is that he actually was assaulted, then asked to have those individuals who assaulted him dealt with. He was told to go back into the crowd. And, at that point, based out of frustration, he says, well, this is my plan. But that was never his plan from the beginning, and the Phoenix Police Department knows that. And this context has been lost this entire time, because that video and the statements there have been characterized as inciting attacks against him. And I don't know what incitement means, if that constitutes incitement.

He's asking: Do you want to have a conversation, and then is, in fact, the victim of assault. And what we said from the beginning when we came here is that they needed to analyze

the video. Because the video that you saw, that version of it, was not anything the Phoenix Police Department has ever seen. Because, to the best of my knowledge, they didn't review the pole camera, even though it was in their possession, and I am certain that they did not sync it with the cell phone video, which is what we did, and you saw it in the corner, which actually provides the context.

And instead you have someone who is engaged in quintessential counter-protesting at this point, not saying anything except for his mere presence, and that's being -- in the briefing I think it was the equivalent of burning down a storefront in a protest. That's how this is being characterized in the public record. And this type of characterization has a significant chilling effect on the other members of AZCOPS.

I would note for the record that I'm happy to provide a copy of the video as Exhibit I to this hearing, but it would need to be sealed, because I only got this record as part of an administrative process, so it's not an open record at this point, because it still relates to that.

But this is the concern that we have is that this person is being called irredeemable. He's being -- it's being said in a public statement. That is unprecedented. Instead of Phoenix even just saying he was terminated, there is a full statement attacking his character that went out, not only to a

media release, affirmatively to the media, but then to the internal constituents at the Phoenix Police Department.

And the City is now saying you have no process, because you can have a two-hour long Loudermill presentation, you can actually go point by point and point out factually false information in a report, and they say they meet their constitutional burden by sitting there, I guess listening, but then not making any changes.

And should the Court want to hear from Lieutenant Thatcher, he would testify that this is entirely unprecedented, in his experience. Because I will say in open court that the Phoenix Police Department and the Professional Standards Bureau has a good track record of actually considering evidence, actually considering the other side as part of the review process, and then modifying their investigations here.

So it's virtually unprecedented to have a situation where you're saying we will not make any changes to an investigation, we won't fix a false narrative, we will in fact advance a narrative to the media and destroy someone's reputation, create a chilling effect for the rest of the members, and then say, well, there is nothing that you can do about it.

And we have a lot more to show you. I know that your time is brief here and we're in an emergency posture, but we're requesting you grant a temporary restraining order, because the

irreparable harm is real, and the narrative without your involvement will be that he's somehow irredeemable, inciting crimes, and this is such a disgrace that he can't even go out in public without being followed around by the media.

So, like I said, that's what I have for this part of my argument. If you'd like to hear from Lieutenant Thatcher, we can. If you don't, my additional part of the argument would be I want to remind the Court of what happened in McMichael-Gombar. So I happen to know a lot about the case because I was there. And the City filed a motion in limine saying we don't want any evidence allowed for any constitutional issues related to the social media policy. And that motion in limine was granted by the hearing officer, and then it was ultimately upheld by the City of Phoenix Civil Service Board.

So I cannot raise a constitutional issue at the Civil Service Board, which is quintessentially key to this case. Because here this activity that you saw in the video -- and I can represent, and I'm happy to, at the full preliminary hearing, provide the entire video and witness testimony about it -- it shows that there is no incitement. There is no provocation. There is no words that he asks to be attacked or insulting people. And the City of Phoenix knows that, yet they're characterizing it differently.

And then when we present them direct evidence of this

in a Loudermill hearing, they ignore it and say you can't actually do anything about it. You can't go to court and get relief. And then they say go to the Civil Service Board, but this is the same city that files a motion in limine to say you can't raise this issue at the City of Phoenix. And, ultimately, if the City's argument is upheld, then that will be a per se prohibition on any type of off-duty political speech, even if it's intended to be anonymous, even if it's lawful, if the City of Phoenix doesn't like it and they decide that it doesn't match their department values, whatever they may be at any given time, they could aggravate it to a termination, have no IRP.

They could say they sat there and listened to a two-hour presentation, whether it has facts, whether it has video, whether it has anything else, they don't have to make any changes, and then you're out of luck, because you can't go to the Civil Service Board and talk about your First Amendment rights. They'll file a motion in limine like they did before. And they ultimately got that approved by the Arizona Supreme Court.

And, actually, at the very end of the Stephanie McMichael-Gombar opinion, the Arizona Supreme Court specifically says: Our decision does not leave classified employees like McMichael-Gombar without a remedy. Classified employees have access to courts to vindicate their

constitutional rights.

For example, classified employees could file a complaint with the state or federal courts pursuant to 42 U.S.C. 1983. And that's why we're here, because we had no process. And, as you know, a Loudermill hearing typically doesn't require much, as long as there is meaningful post-termination relief that's available, but here the City of Phoenix is saying we don't like the counter-protest. And the evidence that we've submitted as attachments and that we will offer, either through Lieutenant Thatcher today or at the preliminary injunction hearing, will show that this case has been treated completely differently than any other case, and it results in a termination that they want to say is unreviewable.

And then as you know from the declaration that was not sealed, we have a situation where we talked about AZCOPS. Well, we have Sergeant Mullen who is now facing a child custody proceeding. And he may lose the ability to actually have time with his kid as a result of this. Because I guarantee you that the exhibit is going to be the City of Phoenix's position on Dusten Mullen, the next exhibit is going to be he was inciting people to commit crimes at a protest. And that is simply not what is shown in the video.

And he can't even release that video, because right now it's confidential under the rules that the City of Phoenix has for administrative appeals. He can't even clear his own

reputation. So this is why relief is appropriate here, because the City of Phoenix has put no evidence on. There is no signed declarations on their side. There is no indication at all as to what they did to review anything because they left everything exactly the same.

And Your Honor gave them a chance, and I was hopeful after the ruling that the City of Phoenix would take that chance, because they represented to you that a termination decision had not been made. Well, now we find that they offered no meaningful consideration, which is what is required even if there was an adequate post-termination hearing, and there certainly isn't one.

So, for those reasons -- if you'd like to hear from Lieutenant Thatcher, I'm happy to call him. If the Court has any questions, I'm happy to answer them.

THE COURT: Just the form that was dated prehearing, that was just sent to employees? That was different from the media?

MR. SERBALIK: Yes. The form that was sent to the employees that was dated prehearing was sent to the employees. And we also offered the other exhibit attached to the reply which shows that this wasn't a copy and paste error, because the original document did not have that footer. So the idea that this would be a copy and paste is not likely because you have a different footer that's on this document.

And we submit -- and certainly, I mean, Lieutenant Thatcher would testify he got calls about that issue of, look, this was predetermined on April 10th, which, as the Court knows, was right after we had political involvement and a misleading media narrative. And the City of Phoenix knows that, and yet in their brief they cite the media that shows only part of that story.

Because the public records release, which we have no control over, but the public records release to the media only shows the snippet without actually showing the context of what happened immediately before, because that other video has not been released. Now, the City of Phoenix has it and they know about it, but they certainly don't talk about it. And then in their media statement they talk about someone being irredeemable.

So this is quintessential stigma-plus, because we don't have here what the City implied in their brief of a typical termination. Which every termination has a degree of stigma, but not every termination is accompanied by a media release and an e-mail to all of your coworkers sending a message that if you do this and we don't like it, we will change everything about our process. We'll sit there and listen to you for two hours, but even if you make good points and you point out factual inconsistencies, although we normally address those inconsistencies, we won't do that here.

And that's the concern that we have. And that's why I appreciate Your Honor taking the time to have this hearing.

THE COURT: Okay. Thank you.

MR. COLEMAN: Thank you, Your Honor.

Plaintiffs describe this in his briefing as a just kind of routine request to preserve the status quo. This is not a routine request. This is a request for a mandatory injunction, which is an extraordinary type of relief that is rarely, if ever, granted in the employment context.

Right now the status quo is that Mr. Mullen has been terminated after he received due process and based on findings of three violations. We only heard about one. One is the provoking adolescents into committing crimes. The other is that he directly lied to the Chandler police. And the other is that he omitted material facts when reporting the matter to his supervisors. So we actually have three different things. So that's the status quo, he's been terminated.

And what he's asking for is for the Court to order that he be reinstated and placed on a taxpayer-funded paid administrative leave for up to two years while this case is pending. Because we all know if this case goes all the way the distance, you know, based on judicial statistics, that will be two years of a taxpayer-funded leave while we adjudicate this. And that is an extraordinary measure that courts do not regularly, if ever, grant.

Now, I want to address a couple things, just the ENS report. I've had my client researching this. Obviously, you know, this has been a very accelerated proceeding. I got off the phone just before I walked in and was told that we can get a sworn declaration from a public information officer that will say that she put the text and wrote the thing into an ENS form and used an older form that had the older date on it and didn't change the date in the footer.

She will say that, you know, she got the information, wrote it up on the day that it was released, which I believe was May 4th. So we can get a sworn declaration to that effect. There is different documents, because Mr. Serbalik mentioned a different one, because there is a chief's communication you'll see from the office of the chief, that doesn't appear to have dates on the bottom. And then there is what's an ENS, which is just coming from the department, I think in general, and that does have the footer. So we could provide that declaration and file it with the Court to clarify that issue.

Now, we saw a small segment of video. I, unfortunately, did not have a chance to see that video before we came here, but here's what it didn't show. Number one, it didn't show Mr. Mullen arriving, making the decision to show up armed with a gun and with ammunition clips and with a mask over his face. And he was there, purportedly, you know, to pick up his son and make sure his son didn't get embroiled in this

protest.

I've been in a lot of pickup lines. I've never seen a parent with a gun and a mask, but he has every right to do that. We're not questioning that he wants to do that. But I think it goes to his mindset and his intention when he shows up like that. What we didn't show is that he -- what they also didn't show is when he first showed up, he approached and started a verbal confrontation with a group of adolescents in a car. We didn't see that part of it in the clip.

We didn't see that the Chandler police strongly encouraged him to move somewhere else so that he wouldn't, you know, escalate the situation, and that he declined to move. So we're only seeing, you know, parts and snippets, not the whole picture.

THE COURT: Yeah, but if you're counter-protesting, they can ask you to move, but if I were there in a civilian capacity, I don't have to stand in any particular spot.

MR. COLEMAN: He doesn't have to, no. I agree, he's exercising his rights. But it just goes to show his mindset, that he was there, I think, based on his statement, to provoke people into committing acts against him. I mean, he said it after the fact, but if an arsonist burns down a building, does it matter if somebody says I planned to burn down the building, or if they say after the fact it was my plan to burn down the building? He said my plan was to have these -- to provoke

these people.

But I want to also talk about the other issues, because these are critically important. So, as you know, integrity and honesty is of paramount importance in law enforcement. Many agencies have a saying that says, "You lie, you die," because if you lie, you can be terminated. AZPOST has said there is no such thing as a small lie or an unimportant lie. A lie is, essentially, a career killer, and it's something that can result in decertification of a peace officer. Well, here, by his own admission, Mr. Mullen lied to the Chandler Police Department.

Now, what's important in his background is in his duties with the City of Phoenix, he actually responds to protests. So he knows how these operations work. So he's there in a volatile situation, and he deliberately lies and falsely tells the Chandler PD that he has 30 armed people with long guns that are coming down to the protest.

He makes this statement, basically, almost like pouring gasoline on an already, you know, incendiary situation. He admits that he was lying to the Chandler police. He knows -- I mean, you saw how chaotic the situation was. He knows making that statement is going to provoke an immediate reaction from Chandler. They're going to say, oh, no, we have 30 armed individuals. This could turn violent. It could turn lethal in a split second. He knows that they're going to

respond to that, and they did start making calls. He knows that it's very likely they're going to redeploy resources.

So here it is a partner agency of the City of Phoenix, a sister agency, and he's lying to them and potentially resulting them redeploying resources from where they're actually needed, and telling them he has 30 armed people coming down to protest. That alone, even if you were to disregard the other thing, I think is a terminable offense.

And if you look at it, it has damaged the relationship. A Chandler council member spoke out about it. The Chandler chief of police personally called the Phoenix Police Department to complain about the behavior. One of the Chandler officers was interviewed, said the situation would have remained calm, but that Mr. Mullen's actions took a situation that was precarious and made it more volatile and escalated the situation. So his behavior and conduct has affected the relationship of trust and cooperation between two agency partners. So that's one thing, the dishonesty.

He also omitted material facts when he spoke to his supervisor. He didn't tell them that he lied to the Chandler police. He didn't tell them about any -- that he was there, you know, armed with the mask and, you know, in an intimidating kind of posture when he arrived. He remained there even though he was supposed to be there to pick up his son even after his son left. So those are just some of the factors.

But I do want to talk a little bit about the merits of the claims, because he does have to prove a likelihood of success on the merits are substantial because he wants a mandatory injunction. And with due process, so we've heard a lot of critique of the investigation, but courts have repeatedly, and I believe uniformly, held that there is no due process right at the investigation phase.

An investigation could be ill-conceived, it could be incomplete, it could be incorrect, it could just be a flawed investigation, but that does not trigger a due process right. We cited multiple cases in our brief for that proposition, including the District of Arizona.

Where due process attaches is when there is a proposed deprivation. So once they say we're going to terminate, due process then kicks in, and there is the opportunity to notice and the opportunity to be heard. This is when somebody can attack the investigation.

This is when they can say it was incomplete, go back and, you know, there is more evidence, you got things wrong, or you excluded stuff, or you failed to look at things, so -- and it's undisputed that Mr. Mullen had his due process rights. A Loudermill hearing is a quick and informal check against an erroneous mistake, right. So he had his opportunity.

He was given notice of the violations. That's not disputed. He was given a Loudermill hearing with decision

makers. He was represented by counsel. He had two hours. He presented, I guess, an 80-point PowerPoint slide with his side of the story and they considered it. And that's what he's entitled to.

Due process is a procedural right. He is not entitled to the outcome that he wants. There is no entitlement to an outcome. If there was, any time somebody goes to a Loudermill hearing and the City says, we're not persuaded, they would have a constitutional claim. And that's not the law. They can't say, well, they didn't reverse my discipline, I have a constitutional claim. That's a merits-based argument.

But for due process, he received what he was due. He had his Loudermill hearing. He wasn't persuaded. I'm sure he's disappointed by that. And we don't know what the exact thought process was. Maybe they thought the dishonesty and the omissions were the most significant conduct. We don't know what weight they gave to everything. But we do know there is strong support in the record for the decision, but it's a procedural right, and he got that procedure.

Now, I also want to mention that for the Section 1983 claims, we're actually filing a motion to dismiss tomorrow. There is no vicarious liability, as I'm sure you know from municipalities. To establish liability for a First Amendment violation or a due process violation, he must show that the challenged action, here the termination and the alleged due

process violations, were committed by somebody with final policy making authority.

Now, there is another decision by this Court, it's Collins versus City of Phoenix, where this Court held as a matter of law that the final policy maker for the City of Phoenix for personnel matters involving police is the city manager. And that comes from the City's charter and the City's ordinances. And there is no evidence in the record that the city manager made a termination decision or made any decision or had any direct involvement in this matter. And this Court actually expressly rejected the argument that the chief of police is a final policy maker.

So I would encourage you to look at the Collins versus Phoenix decision. The summary judgment was granted for the City on the basis that the city manager was not involved in personnel -- the personnel matters involving police, and therefore there is no Monell liability.

On the First Amendment, I don't think it could show likelihood of success on the merits if you get to the substance as well. In the First Amendment context, it's incredibly fact intensive, which that, again, militates against a finding that somebody is likely to succeed on the merits, because we have to dig into the context, circumstances, motivation.

So here the first question is did he engage in speech on a matter of public concern? I don't know that it's clear

that he did, because the statements that we've seen are that, you know, I came here. My plan is to have them arrested. I don't think that's speech on a matter of public concern, nor is a lie about I have other people coming. He has to show --

THE COURT: Not -- it includes other things other than the actual words you say.

MR. COLEMAN: If he were -- yeah, if he were parading or holding a sign or chanting or somehow showing, but he has to somehow show he was expressing something of political or social importance. And I haven't seen where that expression was made, but even if it is, the next thing is he has to show that it was the speech and not the dishonesty and other conduct that motivated -- that was a motivating factor.

And then if the -- if there was protected speech, we get to the Pickering balance. And so the Pickering balance courts have said that they give substantial deference to police departments. You know, police are the only public authorities that have the authority to take away somebody's freedom or take away their life, and so they're held to higher standards. And police have to be able to regulate their paramilitary organization. And so when speech is disruptive to the department's mission, even if it's protected, it could lose that protection. And so the courts balance that and weigh it.

And here if you weigh it on the City side of the equation, you know, there has been a cascade of negative

publicity. There is probably a loss of community trust. People probably who want to protest peacefully are probably wondering, if the police show up, are they here to protect me or to entrap me when they see that a police -- all the headlines after headlines that the police officer shows up to provoke adolescents into committing crimes.

And then the lying, the dishonesty to a partner agency. You know, when City of Chandler and the City of Phoenix have to cooperate on interagency task forces, how does that look when you have an officer who lied to the City of Chandler, and resulting in probably having to redeploy resources and throwing, like I said, gasoline on a volatile situation.

So the -- I believe the Pickering balance weighs strongly in favor of the City. But, in any event, there are questions here that make it so that he can't establish a strong likelihood of success on the merits.

And then finally he has to also show irreparable harm. And there are, you know, hundreds of cases where courts have said, including the US Supreme Court decision, that there is no irreparable harm when there is an employment termination. Even when there is reputational harm, that can be remedied through a monetary payment.

I'm sure that a very high percentage of your docket probably involves employment cases. You know, every day there

is employment cases that are filed, and a lot of them are First Amendment, equal protection, due process. And we don't routinely see injunctions being issued in every termination case. And the reason why is because they're extraordinarily rare, because there is no irreparable harm. Because it's well accepted that a termination can be remedied by backpay and by damages, or even emotional distress damages or reputational harm damages. It can be remedied through money. And that's why courts regularly and routinely deny this type of relief because there is no showing of irreparable harm.

And then as far as the public policy and balance of hardships, you know, if the City's forced to reinstate him, as I said, we may have a two-year leave of absence where somebody is being paid by taxpayer funds to sit and litigate their claim where they may lose at the end. And then does the plaintiff -- does he return the money? Does he get a windfall? Whereas, if the City prevails, and I believe we do, we will, what happens? But if the City doesn't prevail, then he will receive whatever damages he's due, backpay, benefits, compensatory damages for any other alleged harm. He can be made whole. So this is not the type of case where an injunctive relief is appropriate.

And I'm happy to answer if you have any other questions, Your Honor.

THE COURT: Yeah. How do you address the argument about the chilling effect on other officers and their First

Amendment rights?

MR. COLEMAN: Well, first of all, I'm not sure that AZCOPS has standing, because for organizational standing you have to make arguments that don't delve into the specific facts of one member. It has to be a policy or something that's applied to all members equally so that there is no individualized proof.

But, in any event, I don't think there is a chilling effect, because our position is we didn't fire somebody for speech, for protected speech. We fired somebody for dishonesty, provoking a crime, and then speaking to a supervisor and giving an abbreviated version that omitted material facts. So if --

Because the flip side of the coin is if somebody says something protected, and also does three things that are unprotected, a city's paralyzed into inaction, because they can -- somebody can argue that there is -- you know, the protected speech was the motivation. A city has to be able to, at the police department, take action when they have a police officer who they believe has violated his oath to serve and protect, engaged in dishonest conduct, and they can't be paralyzed by fear of a First Amendment claim. The claim can be litigated, but he shouldn't be able to have his job and be paid by the taxpayers while the case is being adjudicated.

THE COURT: And I think Mr. Serbalik said that when

this first started gaining traction, the City only released the clip of him making that statement without other context. Do you know if that's true?

MR. COLEMAN: I apologize, Your Honor. I made my appearance in this case on Friday and I have not seen all of this. I was focused more on the briefing and this issue, so I don't know if that's correct or incorrect.

I will say, Mr. Serbalik and I have litigated lots of cases. If he says something, I believe it to be true, but I don't know from personal knowledge.

THE COURT: Okay. Thank you.

MR. COLEMAN: Thank you.

MR. SERBALIK: Your Honor, I appreciate the kind words from counsel, and I will tell you that being new to a case sometimes can result in some miscommunication.

Sergeant Mullen was not sustained for lying to the Chandler Police Department. There is no discipline that came in the investigation from that. There was an explanation that was offered in the internal affairs interview, which very briefly was that he made that statement because there was already a crowd gathering, and he wanted people to believe that backup was coming, because the Chandler police had insufficient people there to protect him. That was his statement in internal affairs.

Whether you believe it now or don't believe it, it

doesn't really matter. But there is zero slides in the Loudermill presentation that addressed that issue, because that was not sustained by the Phoenix Police Department. So the idea that somehow that statement is going to be used in federal court to justify discipline when it wasn't sustained as a policy violation and we didn't address it in the Loudermill hearing would raise its own concerns.

And even if that statement was sustained, which, again, it was not, then that would be a Class I violation under the Phoenix Police Department's operations orders. Because, at most, that would constitute an element of a misdemeanor that does not involve violence. So that is specifically listed in their classification criteria, because, again, these conversations with the Chandler police officers, everyone agrees there is undisputed evidence in the record that that does not constitute a criminal or administrative investigation to raise that allegation to Class III.

You are welcome -- and we're not asking for you to take a position today that it results in some type of decision for two years of an investigation. What we're asking for is emergency relief, because there is irreparable harm going on right now. And we're happy to set an expedited preliminary injunction hearing so that you can hear more of our evidence, which we absolutely have and are prepared to present to you, that would show that this situation was treated very

differently.

Because we actually do have case law, and it was cited in my reply brief, Thompson versus Riverside, which does stand for the proposition in this circuit that investigations can have a chilling effect and be actionable when they're tied to an employment action, which indisputably happened here.

Also, again, counsel doesn't know the record as well because he's new to the case, which is fine, but there is another false statement that we addressed in the Loudermill, that somehow Sergeant Mullen refused to move or didn't move away. He absolutely moved away. I can represent to the Court that the full video shows that he was walking and he was being followed by the crowd and continued to be assaulted during that time. So this idea that he refused to move is not true.

And as Your Honor pointed out, if he's counter-protesting, he doesn't have to move anywhere. What he has to do is avoid provoking people, which he did not do. And that's what our evidence shows is he did not provoke. He did not incite anyone. He didn't commit disorderly conduct under Arizona law.

Because when I listened to my friend, I was trying to think when can someone counter-protest if they're a Phoenix police officer off duty? Because the logic of his position is that if you counter-protest -- which maybe people don't like counter-protesting. I personally have never counter-protested,

but there is people that like to do that. Their position is if you counter-protest, that can create a disruption.

And then if another police chief calls you and says, I don't like the fact that someone counter-protested, even though they tried to do it anonymously, we can now terminate you and say that this actually hurts your position, hurts the City. Even though you didn't wear a badge, you didn't identify yourself as a police officer, you obeyed the law the entire time, and then they're going to say they're going to terminate you and you will have no process and no one to sue and no one to actually protect your First Amendment rights off duty.

So if the Court declines to intervene, we have a situation where in order to be a police officer anywhere in this district, you would have to give up your right to counter-protest or face unreviewable discipline decisions, because someone else can just say, well, I don't like what you did. Because the City of Phoenix has no policies that address off-duty protest or counter-protest.

They do have policies that would address things, which, again, even at the worst here, you would have the circumstance of you lied to the Chandler police in their investigative stop, which is not a criminal interview, that's classified under their discipline procedures as a Class I. You're not going to lose your job for that. But this is being treated differently. And they want it to be treated

differently.

Also, it is highly unusual for the Phoenix Police Department to put out media statements saying someone's irredeemable and talking about inciting and provoking in federal court, when they know that that's not what the video shows. That's also how this is treated different. The vast majority of terminations are not commented on in the media. And then certainly if they say, hey, look, he has the right to an appeal, they're trying to make a media narrative. And they don't address that at all in their briefing, because that is what stigma-plus means.

This is not a standard employment case where someone just lost their job and now they have to attempt to get income. The reputation is being destroyed. And the City of Phoenix is doing this to send a message: We don't like what you did off duty, attempting to be anonymous. The only reason he's not anonymous is because he was the victim of a crime. We don't like what you're doing. And then they're hoping to get a precedent established that any time you counter-protest, we have an unreviewable process here.

Now, the City of Phoenix also, when you come to the Pickering balancing test, are faced with an interesting issue, because the City of Phoenix has contributed to this public outcry. They issued a statement right in the middle of the investigation. There was no need for them to do that. They're

already saying that when we fall short, they're already characterizing this investigation, and that characterization isn't just on their own because we were so concerned about it. They knew about it since February. They have the pictures. I think they had the pole cam, but I don't think they watched it. But they had exactly what he was wearing. They had exactly what he was doing. And they didn't make any comments until there is a public outcry, because they don't like what the counter-protester stood for.

And I hope the Court doesn't accept the idea that what someone does when they are wearing a Trump shirt at an ICE protest, that is quintessential speech via conduct. And, I mean, you don't have to sit there and have a sign. I don't think that that's the law that exists here, but that's what the City is asking you to adopt at this point.

And when the City of Phoenix is contributing to this public outrage, when they're putting filings in federal court saying that someone's inciting something -- they didn't provide you the videos that showed incitement because they can't. They didn't provide the videos that show provocation because they can't. We've provided sworn testimony. I'm prepared to put on additional sworn testimony. And I would show you the entire video. It's half an hour long. We didn't have the time to do that today.

But we have un-rebutted factual evidence showing that

this case is being treated different. We have arguments that they know are wrong -- not Mr. Coleman because he's new to the case -- but that the City of Phoenix knows are wrong where there is no incitement. Because I think incitement means something. And I would hope that we get clarification on that. Because right now, to Mr. Coleman's point, I have all of the AZCOPS members for the City of Phoenix -- there is over, I think 600 of them at this point -- what do I tell them if they say I want to counter-protest off duty? Because right now it's: You can get fired with no review.

I am going to face a motion in limine at the Civil Service Board, and no matter what, I can show you video evidence, the City of Phoenix, if they don't like your politics, you're going to face an employment action and there is nothing I can do about it. And that is not the law. That's not what the First Amendment means.

And when the Supreme Court recognized this potential hole, they put it in their end of their decision for McMichael-Gombar to say we're not going to have civil service boards do this. We'll listen to the City of Phoenix. We'll litigate this in court, because this is not an edge case. And the arguments that are being presented here are wildly counterfactual, but I'm also gagged from even releasing this information to actually defend my client's reputation.

So the only thing that can happen, and the only thing

that can cure this chilling effect, both now -- and all we're asking for is just until we get to a preliminary injunction, which we can expedite. All we're asking for is that the City of Phoenix reduces this chilling effect, or the Court reduces the chilling effect, by saying that we will do an evaluation. And if the City is unwilling to put up any evidence, not a single sworn declaration in this case, it is not just a free-for-all, because people do have the right to engage in First Amendment activity even if I don't like it.

But, again, I listened carefully, and right now if I had to go back and tell people what the City of Phoenix's position is, it's that you can never counter-protest, even if what you do is lawful. And I would also have to tell them that there may be arguments made in federal court to try to uphold your termination that weren't even sustained as separate policy violations.

And I certainly would have to tell people what the normal process is for discipline investigations, how things are classified, what they've put in their operations orders, but I tell them that goes all the way out the window if this involves politics that they don't like. And that's the concern that I have here, which is why we're asking for the Court to intervene, because that's where the Supreme Court has told us we're supposed to go. And there certainly is irreparable harm that is happening right now, because people do have the right

to protest, whether we like it or not, and police officers don't lose all of their First Amendment rights, especially if they try to remain anonymous, especially if it's not discriminatory.

Now, I will concede, if he was actually inciting people: Hey, fight me. Hey, throw water at me. Hey, come on, like, I want to see what happens here, that's a completely different story, and that would be subject to severe discipline at that point in time, but the evidence does not support that.

THE COURT: Right, but the reputational harm has already occurred. They've already made their statements before discipline, after discipline. He's had his discipline. At this point, the way he gets relief is through a trial and monetary damages.

MR. SERBALIK: Well, partially, because if the Court were to rule that the City of Phoenix has not provided sufficient evidence to show why they treated this differently, that would be wildly covered by the media, and that actually does immediately help his reputational damages that exist here. At a minimum, the City would have to present evidence to show that this was handled in a manner consistent with every other internal investigation. And they can't do that, and they haven't done that. So you can immediately cure that reputational damage.

Additionally, he's facing what I think everyone would

agree is irreparable harm, where he has pending family court matters where this very case is being used as Exhibit A as to why he should lose time with his child. And that's based off of a false media narrative and Phoenix contributing to that false media narrative.

And then the other irreparable harm that I don't really understand the counter to it is that every single member of AZCOPS -- and there is over 600 of them in Phoenix -- is going: What is the standard here for what I can do off duty? Because to allow this to stand with no showing that this is a normal treatment does create a chilling effect on them as well. And that could be immediately repaired by the Court saying, hang on, if you raise a colorable argument, you have sworn statements, you have video that shows that there is an incitement of provocation, the City, not so fast.

You have a massive PowerPoint presentation, two hours of transcripts saying, City, you have to provide a meaningful process. You have to at least consider that. And by consider that, if we're wrong, if the evidence doesn't support that, that's fine, but we provided documents and videos and information that they didn't have. And they didn't change a single word in their report, which, again, the testimony would show is unprecedented.

That's what Lieutenant Thatcher would testify to is that in every other, either IRP or Loudermill presentation, the

normal way -- if it doesn't involve the First Amendment -- the normal way is the City is absolutely receptive and will make modifications when appropriate. Here, not a word. And that is concerning is that the City of Phoenix is saying we get to treat this different. All we have to do is say our opinion is we don't like your politics, and then every protection is out the window.

Because as we showed in the first briefing -- which, again, the Court said, well, maybe they'll fix it at the Loudermill. Loudermills are typically reserved only for the most egregious conduct, talking about sex on duty; falsifying police reports; uses of force involving deadly force that are out of policy. That's what normally goes straight to Loudermill.

Here, the City is saying, if you counter-protest, then it can go straight to Loudermill. That's the concern that we have here is they're asking for permission to do something, to treat this differently because it involves speech. And, again, the testimony that you heard from Lieutenant Bewley is that this was not supposed to be a termination-level case until there was involvement outside of that chain of command. And that's concerning too. People don't like the politics, and then PSB is told: Change your findings. Reclassify this.

So that's what our -- and our evidence has not been rebutted at this point. And maybe the City -- if you believe

that the City can actually rebut it, then we can have an expedited preliminary injunction hearing and let them put on evidence. Let them have people to actually say that this was done the normal way, because the harm to them is minimal.

And the other thing that Lieutenant Thatcher would testify to is that the speed at which they did this is also unprecedented. So this idea of we're going to immediately terminate you, show you up on the termination report, knowing that there is a filing in federal court, knowing that this is an issue, that speed is unprecedented. Why is this so fast?

Because Your Honor gave them a chance, because they told you there may not be any discipline. But, instead, as soon as this was lifted, they wouldn't even give us the five business days that policy allows. Everything is rushed so that there can't be a meaningful review of the First Amendment concerns.

And the testimony would show that the only time this happens is when it involves speech. You have people that are under criminal indictment that their investigation didn't move this fast. And that's wrong. And that can't stand.

THE COURT: Okay.

MR. COLEMAN: Your Honor, may I briefly address just a couple points?

THE COURT: No.

I'm going to take it under advisement. I'm going

to -- obviously, I need to decide whether we're going to have a preliminary hearing or not. So if that is the case, I will contact counsel to get you on the phone to schedule once I make the ruling on the TRO. Okay.

All right. We're at recess.

(Proceedings concluded at 3:48 p.m.)

* * *

C E R T I F I C A T E

I, CHRISTINE M. COALY, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 26th day of May, 2026.

/s/ Christine M. Coaly
Christine M. Coaly, RMR, CRR